### CARPENTER *v.* OSBORN.

### OSBORN *v.* CARPENTER.

PRINCIPAL AND SURETY—MISAPPROPRIATION OF COLLATERAL BY CREDITOR—RELEASE OF SURETY.

A creditor who, having a surety for his debt, receives property from the principal as security for the same debt, becomes a trustee for all parties concerned; and if, without the consent of the surety, he misapplies the proceeds of such property, the surety is discharged to the extent of such misappropriation.

Accordingly, where A. gave a mortgage to B. to indemnify him as accommodation indorser for C., and C. afterwards executed another mortgage to B., as trustee, to secure certain debts, including those for which B. was liable as indorser, under which mortgage B. realized an amount sufficient to satisfy all of the debts so secured, but instead, without the knowledge of A., applied the moneys upon the debts of a firm of which both B. and C. were members, it was *held* that A. was entitled to a discharge of the mortgage given by him, although B. had been obliged to pay the indorsed notes.

Appeal from Kent; Adsit, J.   Submitted November 5, 1895.   Decided December 10, 1895.

Bill by Ellen E. Carpenter against James W. Osborn, administrator of the estate of Edwin Byles, deceased, to compel the discharge of a mortgage; and cross-bill by said administrator against said Carpenter and others to foreclose the same.   From a decree directing the discharge of the mortgage and dismissing the cross-bill, the administrator appeals.   Affirmed.

*Alfred J. Mills,* for appellant.

*Bundy & Travis (Charles S. McDonald,* of counsel), for appellees.

LONG, J.   This bill was filed to compel the discharge of a real-estate mortgage, and a cross-bill was filed to foreclose the same mortgage.   The mortgage was given by complainant, Ellen E. Carpenter, to Edwin Byles April 27, 1876, for the consideration, expressed therein, of $6,000, and contained the following condition:

"*Provided always,* and these presents are upon this express condition, that, if Norman D. Carpenter, of Grand Rapids, Michigan, shall keep and save the said Edwin Byles free and harmless from all payments and expenses as accommodation indorser for said Norman D. Carpenter and Carpenter, Judd & Co., according to one bond bearing even date herewith, executed by said Norman D. Carpenter to the said party of the second part, then these presents and said bond shall cease and be null and void."

The bond was executed by Norman D. Carpenter, the husband of complainant, on the same day of the execution of this mortgage, and contains the following condition:

"The condition of this obligation is such: *Whereas,* the said Edwin Byles, for the ensuing year, and longer

107 MICH.—20

if desirable, proposes to indorse the negotiable paper of the said Norman D. Carpenter and of Carpenter, Judd & Co., of Grand Rapids, Michigan, to an amount not exceeding $6,000 at any one time, for the accommodation of the said Norman D. Carpenter and Carpenter, Judd & Co.: *Now, therefore*, if the said Norman D. Carpenter shall keep and save him, the said Edwin Byles, free and harmless from all payments, costs, expenses, and disbursements made by him on account of any indorsements that he may make as aforesaid for the accommodation of said Norman D. Carpenter and Carpenter, Judd & Co., without fraud or delay, then the preceding obligation to be void; otherwise, to remain in full force and virtue."

The title to the property mortgaged was in the complainant, Ellen E. Carpenter, at the time of the execution of the mortgage, and had been for many years. It was her homestead, consisting of one lot, with a dwelling house thereon, and was occupied by her and her husband as their home, and was of the value of $7,000 or $8,000, and appears to have been the only property of which she was possessed. At the time of the giving of the mortgage, her husband, Norman D. Carpenter, was engaged in business in Grand Rapids as one of the firm of Carpenter, Judd & Co., composed of himself and Elliott E. Judd, carrying on a hardware business. He was also engaged in several other lines of business, outside of Grand Rapids, in which Edwin Byles was also interested. At the time the mortgage was executed, Mr. Carpenter was somewhat financially embarrassed, as was also the firm of Carpenter, Judd & Co., which was asking considerable credit at the bank; and, as shown by the proofs, he induced his wife to execute this mortgage as collateral to the bond he had given to Mr. Byles. There was no consideration moving to the wife, which fact was well known to Mr. Byles.

About the time of the execution of the bond and mortgage, Carpenter, Judd & Co. made an arrangement with the City National Bank of Grand Rapids for a loan of

$5,000, giving its note therefor, upon which Mr. Byles was indorser. Carpenter, Judd & Co. continued to do business up to 1881, and Mr. Byles indorsed its paper from time to time, when, on June 2d of that year, the firm, as well as Carpenter, became considerably involved. A meeting of the principal creditors was held, in which the cashier of the City National Bank also participated, and it was arranged that a chattel mortgage should be given by Carpenter, Judd & Co. to Edwin Byles, as trustee, to secure creditors. The mortgage was dated June 2, 1881, and covered all the stock in trade of Carpenter, Judd & Co., and secured to Samuel Judd, $5,575; Florence A. Carpenter, $3,105; the City National Bank, $5,079, upon four separate notes; Edwin Byles, $11,030,— and also to take up, in the event of its not being paid at maturity by the makers or prior indorsers, certain commercial paper held by the bank, upon which Carpenter, Judd & Co. was indorser, to the amount of about $6,000. Immediately upon the execution of this mortgage, Mr. Byles went into possession of the property thereunder. Soon afterwards, certain other creditors attached the property, subject to the mortgage, and an arrangement was thereupon made between Carpenter and Byles to take care of those claims, which Byles did by bidding in the property, subject to the trust mortgage. At this time the stock covered by the mortgage was worth at least $35,000, and the debts specified as secured by it amounted to $24,790, aside from the contingent liabilities of Carpenter, Judd & Co. on commercial paper in the bank, the payments on which amounted, according to the evidence, to about $1,000.

Byles, as trustee, continued the business as theretofore carried on by Carpenter, Judd & Co., kept his account at the City National Bank, and, out of the proceeds of sales, paid and discharged all of the debts in full, except that to the City National Bank. Certain portions of this indebtedness, in the form of notes, were renewed from time

to time, so that there remained unpaid, at the time these proceedings were commenced, over $3,000 to the bank. After Byles, as trustee, took possession of the stock, and commenced to carry on the business, he left Norman D. Carpenter in charge, though from time to time Mr. Byles examined the books, and kept a general oversight of the business. Florence A. Carpenter, the sister of Norman D., was the bookkeeper.

At the time the chattel mortgage was given, Mr. Byles, as well as Norman D. Carpenter, was a member of the firm of Frank Seymour & Co., doing a lumber business at Trufant and Maple Hill, and other places. This firm was largely in debt, and, according to the testimony, large sums of money were withdrawn from the sales of goods of Carpenter, Judd & Co., and paid upon the debts of Frank Seymour & Co. Within six months after the chattel mortgage was given, Florence A. Carpenter and Samuel Judd were paid in full, the City National Bank was paid $2,250, and upwards of $9,000 was paid on the debts of Frank Seymour & Co., from the sales of goods of Carpenter, Judd & Co. In the meantime Norman D. Carpenter had purchased from Elliott E. Judd all his interest in the firm, so that Edwin Byles and Norman D. Carpenter had the whole matter in charge.

The complainant's claim is—and we think it is substantiated by the evidence—that there came into the hands of Edwin Byles, as trustee under the trust mortgage, many thousands of dollars more than enough to have paid all the paper upon which Mr. Byles was indorser for Norman D. Carpenter and Carpenter, Judd & Co., and that, instead of paying and taking up the paper at the bank, given by the firm and indorsed by him, Mr. Byles permitted these trust moneys to be withdrawn and paid upon the debts of Frank Seymour & Co.; that, by reason of these moneys coming into the hands of Mr. Byles under this trust mortgage, he was bound to pay the debts in accordance with its terms, and save the com-

plainant harmless under her mortgage. She further claims that, during all this time, she had no notice or knowledge that the funds were being misappropriated, or of the condition of affairs between her husband and Edwin Byles, or the disposition that Mr. Byles was making of the funds of Carpenter, Judd & Co. The mortgage on complainant's property was not recorded until January 28, 1886, and it is claimed on the part of the defendant, the administrator, that Mr. Byles became dissatisfied with the conduct of the affairs of the firm by Mr. Carpenter, and, to protect himself against his indorsements, he then recorded the mortgage. Mr. Byles died in the month of September, 1888, and defendant, Osborn, was appointed administrator. The note of Carpenter, Judd & Co. to the bank, indorsed by Mr. Byles, was paid by the administrator after his appointment, and is the basis of the claim now made upon the mortgaged premises.

Most of the allegations in the bill of complaint are denied by the administrator, and it is claimed by him that the testimony shows that the balance of the original loan from the bank, after the payment of $2,250 made thereon, was always carried along by Edwin Byles and Carpenter, Judd & Co. as a transaction entirely separate from their other dealings, until the death of Mr. Byles. And defendant further insists that the record does not show that an excess over the indorsements of Mr. Byles upon the paper of Carpenter and of Carpenter, Judd & Co. was received by Mr. Byles as trustee, and that this fact could be ascertained only by an accounting between the parties; that, after Mr. Byles' death, Norman D. Carpenter filed a claim with the commissioners upon that estate for many thousands of dollars, asserting that Mr. Byles was indebted to him in those amounts; and that such claim was disallowed by the commissioners. It is further insisted that the proofs show that Mr. Byles was a loser in the transactions had with Norman D. Car-

penter and Carpenter, Judd & Co., that the mortgage in
suit has not been paid, and that the balance found due
to the bank, and which the administrator has paid, is a
legal and equitable claim under the mortgage given by
complainant.

We think but one conclusion can be reached under the
testimony in this case, and that is that Mr. Byles, as
trustee under the mortgage, received from the business
of Carpenter, Judd & Co., not only sufficient moneys to
pay and discharge all the debts stipulated in the mort-
gage to be paid, including this debt to the bank, but also
large sums of money which were paid in taking up and
discharging the indebtedness of Frank Seymour & Co.,
of which he and Norman D. Carpenter were both mem-
bers. The condition of complainant's mortgage was that
Mr. Carpenter should keep and save Mr. Byles free and
harmless from all payments and expenses as an accom-
modation indorser for Norman D. Carpenter and Car-
penter, Judd & Co., according to the condition of the
bond; and the bond was conditioned to save Mr. Byles
harmless from such indorsements and disbursements as
he might make for them. The chattel mortgage was
given for the purpose of enabling Mr. Byles so to dis-
pose of the trust property that the debts therein enu-
merated should be paid; and among the debts enumerated
is the one to the bank, upon which this claim is now
being made. Mrs. Carpenter stood in the relation of a
surety for Norman D. Carpenter and Carpenter, Judd
& Co. to Mr. Byles. When he took into his possession
all the property of Norman D. Carpenter and Carpenter,
Judd & Co., it was his duty so to dispose of it as to dis-
charge the obligations therein enumerated, and thus save
Mrs. Carpenter harmless under her mortgage. Instead
of this, he used the funds for other purposes. He stood
as trustee for all the parties concerned; and, we think,
under well-settled rules, under the circumstances here
stated, Mrs. Carpenter became discharged from all lia-

bility under her mortgage. Brandt, Sur. (2d Ed.) § 440.
The rule is laid down in Colebrooke, Collat. Sec. § 239,
that a creditor holding collaterals is chargeable with a
trust concerning the same for the benefit of the surety,
where he has notice of the existence of such relation
between the parties. In *Grand Rapids Savings Bank* v.
*Denison*, 92 Mich. 418, it appeared that a husband con-
veyed portions of his real estate to his wife. Afterwards
the husband and wife mortgaged the entire property to
secure the husband's debt, which was further secured by
a chattel mortgage on the husband's stock in trade, and
by his turning over to the mortgagee a number of notes
belonging to him. It was held that the wife was en-
titled, even in the absence of an express agreement, and
as a matter of law, to have the chattel mortgage ex-
hausted and the notes accounted for before the sale of her
real estate under the mortgage. The same principle was
recognized in *Alpena Nat'l Bank* v. *Greenbaum*, 74 Mich.
157.

The complainant contends, further, that under the
bond, to secure the performance of which the mortgage
was given, her liability did not extend beyond the year.
We need not discuss this question, as we are satisfied,
beyond question, that there were sufficient moneys com-
ing into the hands of Mr. Byles under the trust mort-
gage to pay and discharge this indebtedness, as well as all
other indebtedness enumerated in the chattel mortgage.

The court below found, upon the whole record, that the
mortgage had been fully paid and satisfied, and directed,
in its decree, that the mortgage be discharged of record.
That decree will be affirmed, with costs.

McGRATH, C. J., GRANT and HOOKER, JJ., concurred.
MONTGOMERY, J., did not sit.